Mr. Justice James
delivered the opinion of the court.
The complainants bring this suit for infringement of Letters Patent No. 222,264, issued to them as assignees of Thomas J. Flagg, one of the complainants, for an improvement in scarfs for gentlemen’s wear. It alleges thaj; Flagg, prior to the 14th day of August, 1879, was the original and first inventor of a new and useful improvement in neck scarfs ; that prior to that date he sold and assigned to the complainants the full and exclusive right to his said invention, and that, upon due application, these letters were issued to complainants on December 2, 1879. It charges infringement by the defendants, and prays that they he restrained both by preliminary and perpetual injunction from such infringement ; that they render an account of their manu *356 facture or sale of scarfs in infringement of complainants’ right, and be decreed to pay damages resulting to complainants from such manufacture and sale.
Flagg’s specification, which is a part of complainants’ patent, set forth that his invention relates to that class of scarfs for gentlemen’s wear known to the trade as “ flat ” scarfs. It then describes the previous state of the art in the following words :
“ Heretofore the aprons used in combination with the center piece in the construction of this style of scarfs have been* each in the general form of a parallelogram, the upper edge being cut or folded over in a right line at right angles to the length of the piece, and parallel or nearly so to the lower edge thereof, leaving the upper outer corners of the aprons, after the aprons are crossed and adjusted in place upon the center piece, projecting outward in a sharp angle liable to catch in the vest of the wearer, to work out and become exposed, and to operate oftentimes as a means for disarranging the whole scarf. I have found likewise the combination of a flat scarf with an ordinary shield, tapering more or less from a comparatively wide center to narrow ends, disadvantageous, in that the upper outer edges of the scarf are left unprotected by the shield, and measurably undefined by the neck band, resulting in an ill fit of the upper portion of the scarf upon the wearer.” He then explains that the object of his invention is, “to remedy these defects in the old style of flat scarfs, and to so improve and perfect the same as to obtain a neater and more comfortable fit of the upper part of the scarf about the neck of the wearer, and give a handsomer finish thereto when properly secured in place by the neck band.”
The description of the invention itself and of its operation is as follows :
“ It consists in combining with the center piece of a flat scarf two aprons, each of which has the upper portion of its outer edge cut or folded to form an elliptical curve, said curve commencing at or near the point crossed by the neck *357 band, and extending thence to a point below the widest part of the scarf from whence the edge is left to extend in a right line parallel to the inner edge.
“ It consists likewise in the combination with a flat scarf of a shield conforming in length to the entire width of the upper portion of the scarf, so as to support and stiffen the outer edges of the scarf, and so constructed as that the length of its upper edge shall equal or exceed that of its lower edge, and the outline of its outer ends conform substantially with the corresponding edges of the scarf.
“ In the accompanying drawings figure 1 is a front view, and figure 2 an elevation of the reverse or under side of my improved flat scarf.
“ A, fig. 1, is the center piece, B B the aprons, and C the neckband of the scarf. The aprons are arranged to cross the one over the other (see fig. 1), and the upper corners of the inner edges thereof are secured to the outer ends of the centerpiece in the usual manner.
“ The upper corner of the outer edge of each apron is cut away and turned under to present an elliptical curve, beginning at the upper corner, d, of the inner edge of the apron, and extending thence to a point about midway the length of the scarf, as shown in fig. 1. The effect of combining this form of apron with the center piece as described, is to narrow somewhat the upper portion of the scarf, and to obviate the projecting angular corners found in such scarfs as heretofore made.
E, fig. 2, is an improved shield for stiffening the upper portion of the flat scarf and improving the fit thereof. The length of the shield E equals the width of the upper portion of the scarf, the ends of the shield being made to extend out to the outer edge of the aprons of the scarf, with which they are made to conform in outline, and to which they are secured, as shown in fig. 2. The ends, f f, of the shield correspond substantially in width with the central portion thereof. The shield is made of cardboard, thin metal or other suitable material.
“The neckband, C, is secured to the scarf at the upper end *358 of one of the aprons, and its tip w is left free to pass under the shield through a suitable opening at the top of the other apron (see dotted lines, fig. 2), and passing out from the lower edge of the shield, is properly secured, as desired, by means of the needle K or other equivalent device.
“ When the neckband is passed around the neck and through under the shield, and drawn up to be fastened by the needle, K, the tension upon the ends, f f, of the long shield, E, will operate to impart such a curve to the shield and scarf as will produce a graceful, easy fit, the upper outer edges of the scarf being so stiffened and supported by the extended ends of the shield so as to be constantly maintained thereby in proper adjustment, while the elliptical curve of these edges prevents them from catching and engaging in the clothing, and imparts a neat and ornamental finish to the entire scarf.
“ It is evident that the lower edge of the shield may be partially indented or cut away, either in the center or at the ends, without departing from my invention, in which I contemplate such a relative proportion of the ends with regard to the center as that the former shall approximate the width of the latter, and impart firm support to the upper end of each apron along its outer edge.”
Having thus described his alleged invention and its functions and operation, the applicant stated his disclaimer and his claims, as follows :
“ I do not claim, broadly, a scarf composed of a center piece and cross aprons with the upper portions rounded as shown in English Patent No. 3,851 for the year 1873: but—
“ I claim as my invention :
“ 1. The combination with the center piece, A, and neckband, C, of a flat scarf, and with each other, of crossed aprons, B B, each cut or folded to form an elliptical curve, beginning at the point crossed by the neckband, and terminating at a point below the widest portion of the scarf, *359 substantially as herein set forth, for the purpose described.
“ 2. The combination, with the upper portion of a flat scarf and with its attached neckband, of a shield or stiffening piece covering the entire width of the upper end of the scarf, and the length of whose upper edge equals or exceeds that of its lower edge, substantially as and for the purpose herein set forth.
“ 3. A flat scarf, having its upper edge extended in a right line to bend upon the neck of the Wearer, in combination with a.stiffeniug piece or shield projecting to the extremities of said upper edge, and with a neckband so intersecting and engaging said upper edge at or near its extremities as to produce, when properly secured, a flexion of the shield and scarf, substantially as and for the purpose herein set forth.”
It is claimed by the respondents that for several reasons this patent is void ; but before we consider these propositions, we will refer to a preliminary objection to the terms of the assignment and of the grant itself.
It will be observed that the three persons to whom the patent was issued are designated therein simply as Fisk, Clark and Flagg, further described as of New York city. The recorded assignment sets forth that “I, Thomas J. Flagg, of the city and State of New York, have and do assign unto Messrs. Fisk, Clark and Flagg, of said city and State of New York, the full and exclusive right to a certain new and useful invention in gentlemen’s scarfs, for which I am about to make application for Letters Patent of the United States, and which is fully set forth and described in the specification prepared and executed by me preparatory to obtaining Letters Patent of the United States therefor.” It is objected that this assignment is void for uncertainty of parties, because it does not set forth the first names of the so-called assignees. In other words, it is objected that no assignment was presented to the Commissioner of Patents, and that he therefore acted without jurisdiction in issuing a patent to the persons called Fisk, Clark and Flagg, as assignees of Thomas J. Flagg. The same ob *360 jection of uncertainty of parties was urged to the patent itself. We think that these objections are not well taken.
Such a designation may be the ordinary and proper description of a partnership firm, that is to say, may be the name and style by which they are known. It may, therefore be applied to the parties intended, by proof of the existence of a partnership bearing that name, and of an actual delivery of the assignment to the partnership so known and designated ; and this proof has been fully supplied in the case before us. The uncertainty of parties is different only in degree, not in' kind, from that which may exist when the whole name of the party is stated in an instrument. In both cases the parties need only to be ascertained by sufficient parol proof. See Morse vs. Carpenter, 19 Vermont, 613. The same reasoning is applicable to the subject matter of assignment. The particular matter assigned is designated as the exclusive right to an invention described in a specification already prepared and executed by the assignor. The means of ascertainment are furnished, and the proof in ascertainment has been supplied.
We come, then, to the contents of the patent. The respondents insist that it is void because it contains a misstatement of essential facts relating to the state of the art, inasmuch as the specification, which is part of the patent, sets forth that, prior to Flagg’s application, the aprons of flat scarfs had been made in the general form of a parallelogram, with objectionable projecting upper outer angles, It would be cumbrous, and it is needless to describe here the characteristics of the exhibits produced in support. of this objection. We have examined them, with the testimony, relating to them, and have found that the greater.number were not what have been known in the trade as “ flat scarfs,” and were neither intended nor adapted to serve the purposes of that class of scarfs. As to those which actually were of that class, we are of opinion that they fail to demonstrate any essential misrepresentation in the application for a patent. It was not essential that they should prove to have been iu the precise form of a parallelogram. The essential point *361 was, that, by reason of being cut or folded after the same law as the parallelogram, so far as that form presented angles, they did in fact expose angles in the same manner with a parallelogram, and that these angles caused disarrangement of the scarf under the action of the waistcoat. Even if variations from that form be shown in previously existing flat scarfs, no misstatements of essential facts is thereby established, if that variation left the same angles with the same effects. Such a misstatement as to geometrical form could not mislead the Commissioner of Patents as to the propriety of granting a patent for a new device which remedied the defect. We have observed that the aprons of some of these earlier flat scarfs did depart considerably, in a geometrical sense, from the form of a parallelogram, but we have observed also that in these cases the disturbing angle, which a parallelogram would have left, was only shifted to a new position and rendered less troublesome. It was not removed nor wholly deprived of its effects. The object of this part of a specification is to describe the defect or want to be remedied; in this case that defect did exist, and it was indicated with substantial correctness. We hold, then, that the objection of essential missrepresentation of the state of the art is not supported.
It was next objected that, while this patent is granted for the invention of improvements upon “ flat scarfs,” the thing to be improved is itself left indefinite. This indefiniteness is not apparent on the face of the patent. The thing to be improved is there described as what is “ known in the trade as flat scarfs;” and in contemplation of law such a description is certain and definite. What a flat scarf, as known to the trade, actually was, and what was meant by “ the trade,” was a matter to be ascertained by proof, and we think that both facts were sufficiently ascertained in this case. The questions of invention of operative combination, and of novelty presented to us, relate to this particular class, and to no other class of scarfs for men’s neckwear; and we have found in the proof a safe guide in determining the application of these questions. *362 We have next to consider, therefore, the improvements claimed to have been made upon existing styles of scarfs. And first, we must ascertain the meaning and scope of the three “ claims ” of invention.
The respondents, in applying the principle that a claim cannot be enlarged by reading into it anything from other parts of the specification, have treated these claims too much as isolated propositions. It may be that the courts are stricter than they used to be in limiting a patent to what is technically claimed, although a larger invention may have been shown in the descriptive part of the specification ; but we are not aware that any new policy of strictness has been introduced in ascertaining what is in fact claimed. However careful we must be not to enlarge a claim, we are left free to apply intelligently and fairly, for the purpose of ascertaining its actual meaning, every part of the specification to which it refers ; and we are to consider as embodied in the claim whatever by fair interpretation is drawn into it from the other parts. Thus as to the form and 'proportions and arrangement and position of the elements of a combination mentioned in the claim, we understand that the claim refers to a combination of these elements when they are formed or proportioned, or placed exactly as they are described in the model and descriptive part of the specification, or when they are formed or proportioned or placed substantially as there described and for. the purpose there stated. In this way we propose to determine the meaning and scope of these claims.
Claim 1 is for “the combination with the center piece, A, and the neckband, C, of a flat scarf, and with each other, of crossed aprons, B B, each cut or folded to form an elliptical curve, beginning at the point crossed by the neckband, and terminating at a point below the widest portion of the scarf, substantially as herein set forth for the purpose described.” In the descriptive part of the specification, we find this combination described in the same words, except that, after giving the terminating point of the curve, the description states that from that point “ the edge is left to extend in a *363 right line parallel to the inner edge.” Then, in the explanation of the drawing, it is stated that: “ The aprons are arranged to cross the one over the other (see fig. 1), and the upper corners of the inner edges thereof are secured to the outer ends of the center piece in the usual manner. The upper corner of the outer edge of each apron is cut away and turned under to present an elliptical curve, beginning at the upper corner, d, of the inner edge of the apron, and extending thence to a point about midway the length of the scarf, as shown in figure 1.” We have here a definite description of the point at which the curve begins, of its form, of the point at which it terminates, and of the manner in which the apron is combined with the center piece. It is secured to the outer end of the latter. Next, as to the neckband. Figure 2 represents the back of the scarf. The description of the elements there shown relates chiefly to the shield, an element not included in claim one ; but the next paragraph relates in effect to both drawings, and in part to claim one, when it describes the placing of the neckband. It is there stated that: “ The neckband, C, is secured to the scarf at the upper end of the aprons, and its tip, W, is left to pass under the shield through a suitable opening at the top of the other apron.” The neckband, then, is be attached in this combination to the scarf itself, by being attached at the upper end of one of the aprons. This claim, as explained by its references, appears to us to be definite and intelligible. The center piece occupies the angle formed by the crossing of the aprons, the upper inner corner of each of the aprons is secured to the adjoining outer end of the center piece, the curve of the aprons begins at the upper corner of the inner edge of each apron, as indicated by the point, d, in the drawing, and the neckband is fastened to the scarf at the upper end of one of the aprons; in other words, it is shown to be fastened to the top edge of the scarf. There is no uncertainty as to the elements of which this combination is to consist, nor as to the manner in which they are to be put together. The respondents deny, however, that they form a combination, or *364 any more than an aggregation of elements. We have therefore to consider whether they co-operate; and, first, whether the neckband, as here combined with the ellipitical apron, so co-operates with its form as to enable the latter to accomplish the object of that form.
It is plain, while this form, in which projections are removed, is of itself adapted to avoid disturbance from the lateral pressure of the vest, it must accomplish this object more perfectly if something attached to it operated to draw the curved line against the breast of the wearer, and away from the vest. In that case the curved line, although contributing by its form to the avoiding of disturbance would depend, for its more perfect operation for that purpose, upon the aid of its attachment; and there would be no question of co-operation. It is claimed that precisely this assistance is given to the elliptical apron by the neckband as attached in this combination. We think that upon a mere inspection of the manner and place of this attachment, as shown in the drawings and verbal explanations of the specifications, and, therefore, as claimed by reference, it appears that a neckband attached to the top line of the aprons, as here shown, does operate to draw the whole of the curve towards the breast of the wearer and away from the vest, and in this way does assist the forms of-.the apron to accomplish its purpose of avoiding disturbance from the lateral pressure of that garment; in other words, that it co-operates with the form of the aprons, for the purposes set forth in the specification. It was objected in argument that the office of the neckband, which is an old element of flat scarfs, could not be said to be involved in the form of the aprons, because it would perform all of its functions if attached to a flat scarf having the angles mentioned 'in the description of the state of the art, We think this is not correct. If attached in the manner of this combination to an apron having disturbing projections it could not operate to hold that disturbing line to the breast in such a way as to serve the purpose proposed. It might operate as a mere neckband, figuring as a turn of the scarf around the neck, *365 and holding the front of the scarf up to the neck, but it would not acquire its new office of drawing the edges of the apron to the breast in such a way as to avoid disturbance from the vest. It acquired its function of helping to produce a better fit of the edges of the scarf by means of its combination,- in the manner here described, with certain lines capable of being affected by it in the manner and for the purposes set forth in the patent. We think that the neckband in this combination co-operates with the elliptically curved aprons for the purposes set forth.
Next., as to the center piece. The respondents insist that this element performs no mechanical function whatever; that il serves merely to fill a space and thereby to give a proper'esthetical effect to the scarf, and that, if it should be removed, the other elements, the neckband and the aprons, would perform their functions in the same manner as if it were present. In support of this position they cite the opinion of the expert called by the complainants themselves, who says: “ I am not aware that the center piece has, as such, any mechanical function. It covers a space between the crossed aprons.” The attention of the expert was not called to the manner in which the center piece was attached and secured to the inner edges of the aprons. We think that when thus attached it plainly does more than fill or cover a space between the crossed aprons. Unless something, thus occupying the angle formed by the crossing of the aprons, should hold down the inner edges of the aprons, the draught of the neckband- upon the aprons, which this combination involves,, would cause those edges to lift away from the breast and would disarrange the form of the angle. Thus the neckband would have to perform the mechanical office to which we have referred at the expense of doing mischief to the operation and fit of the aprons on the other side. The center piece therefore enables the neckband to perform its mechanical function in the proper manner, and thus contributes to the completeness of that mechanical action. Clearly it is not necessary that this element should co-operate directly with the form of the aprons, in order to *366 be a co-operative element of the combination for the purpose set forth in the patent. If it helps the neckband to co-operate in the proper manner with the form of the aprons^ that is to say, to act as a draught upon the aprons without producing disarrangement of those aprons on the other side, it operates in furtherance of the operation of the neckband. And even if the final result of this co-operation were merely to produce an esthetical effect, the means by which that result was effected would none the less involve mechanical co-operation. We think that an original combination of the kind claimed in this patent is patentable.
Claim 2 is for “ the combination with the upper portion of a flat scarf, and with its attached neckband, of a shield or stiffening piece covering the entire width of the' upper end of the scarf and the length of whose upper edge equals or exceeds that of its lower edge, substantially as and for the purpose herein set forth.” For the manner in which it is combined with the upper portion of the scarf and the attached neckband, the manner in which it covers the entire width of the scarf, the manner in which its upper edge is to equal or exceed in length its lower edge, and the purposes of this combination, we are referred to other parts of the specification. These references involve some repetition. The descriptive part of the specification states that the invention “ consists, likewise, in the combination with a flat scarf, of a shield conforming in length to the entire width of the upper portion of the scarf, and so constructed as that the length of its upper edge shall equal or exceed that of its lower edge, and the outline of its outer ends conform substantially with the corresponding edges of the scarf.” The specification then adds : “In the accompanying, drawings figure 1 is a front view, and figure 2 an elevation of the reverse or under side of my improved scarf. * * * E, figure 2, is an improved shield for stiffening the upper portion of the flat scarf and improving the fit thereof. The length of the shield, E, equals the width of the upper portion of the scarf, the ends of the shield being made to extend to the outer edge of the aprons of the scarf, with which *367 they are made to conform in outline, and to which they are secured, as shown in fig. 2; The ends, f f, of the shield corresponds substantially in width with the central portion thereof. * * * The neckband, C, is secured to the scarf at the upper end of one of the aprons, and its tip, W, is left free to pass under the shield, through a suitable opening at the top of the other apron (see dotted line, fig. 2), and passing out from the lower edge of the shield, is properly secured, as desired, by means of the needle, K, or other equivalent device. When the neckband is passed around the neck and through under the shield, and drawn up to be fastened by the needle, K, the tension upon the ends, f f, of the long shield, E, will operate to impart such a curve to the shield and scarf .as will produce a graceful easy fit, the upper outer edges of the scarf being so stiffened and supported as to be constantly maintained thereby in proper adjustment. * * * It is evident that the lower edge of the shield may be partially indented or cut away, either in the center or at the ends, without departing from my invention, in which I contemplate such a relative proportion of the ends with regard to the center, as that the former shall approximate the width of the latter, and impart firm support to the upper end of each apron along its outer edge.”
It is objected that the “ upper edge ” of the shield in this combination is not so defined as to enable a manufacturer to know whether he is using a shield which falls within the claim. Taken by itself, the statement, that the length of the upper edge shall equal that of the. lower edge, is unintelligible and precise ; but uncertainty is said to arise when it is applied- to the shield exhibited in this patent. We agree with the observation of the expert called by the complainants themselves, that the language of this part of the claim is infelicitous as a description of this element; but w.e agree also with his opinion that in the description referred to by it, the sense and manner in which the length of the upper edge shall equal that of the lower is sufficiently shown. They show that a part of the aprons or scarf, are to be taken into account in ascertaining how the length of the *368 upper edge is to equal that of the lower. The neckband, which is one of the elements of this combination, is decribed as “ secured to the scarf at the upper end of the aprons.” Of course, when brought around the neck it intersects the upper ends of the other aprons at the same relative point. In other words, as we have already said, it occupies positions on the upper edge of the scarf; and as a shield which covers the whole of the upper portion of the scarf must have coincident lines, the neckband occupies the same relative positions on the upper edge of the shield. Now, the verbal description and the drawings show that the neckband, while thus intersecting the upper edge of the scarf and shield, occupy, on either side, a portion of the elliptical curves, and that these curves are therefore to be taken into account in speaking of the length of the upper edge of the shield.
But to what extent are these curves to be understood as included in the description of “ upper edge ? ” Respondents insist that the claim, in order to be definite enough to be valid, should fix the precise points at which the upper edge in question is to terminate on either side; but this objection misapprehends its language and intent. A requirement that the length of the upper edge, shall equal or exceed that of the lower edge, calls for certainty of extent, or points of termination, only to this effect, namely, that the line in question shall be “ upper edge ” in a true sense, at least to such an extent that its length shall equal that of the lower edge. Any shield which presents, inclusive of portions of its curves, a" true upper edge until that edge reaches points at which its length is equal to that of the lower edge, is, in this respect, ashield which falls within the claim. Whether it does so is determinable upon inspection of the form of the edge, and, up to the points at which it -shall be found to be equal to the length of the lower edge, the standard expressed is perfectly definite and certain. Beyond these points the language of the claim does not propose to fix precise termini, and if in any ease, there is uncertainty as to how far beyond these points the edge in question preserves the character of upper *369 edge, that uncertainty is wholly immaterial. We have only to add, that when we apply this claim to the form of shield exhibited in the patent, we find there a true upper edge which has a length, even by transverse measurement, equal to that of the lower edge. We proceed then to consider the operation of this combination.
The co-operation of the shield and scarf is obvious. A stiffening piece which conforms in outline with the edges of the aprons, and is secured to them, cannot fail to perform the office of supporting them against disturbance by pressure of the vest. It does not follow, however, that the edges so supported will therebybe made to fit to the person, and thus more completely escape that pressure; and it is here that the co-operative action of the neckband and the shield applies. When drawn up and fastened, the neckband, “ by tension upon the ends, f f, of the shield,” as pointed out in the description, will operate to impart flexion to the shield, and therefore to the scarf, and thus to draw the edges of the latter down to the breast and away from the pressure of the vest, provided it is applied to the shield in such a way, or to a shield having such proportions, that the flexing of one of its edges will flex the whole of of it in the manner desired. Now, this effect depends upon the proportions of the upper and lower parts of the shield. If the flexing force is applied to a very short upper edge it would hardly flex the lower edge at all, but it would have greater power to do so, just as the length of the upper edge approached that of the lower. In a word, the co-operative action of the neckband depends upon the proportion of the two edges to be flexed, and this is a co-6peration with the proportions of the shield.
Of course the neckband would have performed its office as a mere neckband without reference to the size or shape of the shield, and it did not acquire any new function as a neckband by attachment to this particular form of shield. But that is nothing to the purpose in this question. The object of this combination was to convert what was before only a neckband into a flexor of the shield and scarf, so as *370 to produce a closer and more comfortable fit to the breast, and this function could be acquired by it only when attached in a particular manner, and to something adapted to flexion ; and if this adaptation depended upon the proportions of the thing to be flexed, theu its new function was to be acquired by connection with those proportions. It is only necessary to recognize the neckband by the secondary name of flexor, its true name in this relation, in order to perceive the cooperation between that element of the combination and the shield described in the claim.
As this matter of the flexion of the shield is specifically mentioned in claim 3, which we have not yet examined, and is not so mentioned in the claim now under consideration, it may be proper to observe that we do not confound the two nor transfer the subject of one of them into the other, when we state that the object and purpose of the neckband in the second combination is to flex the shield. The special purpose of the shield, as indicated in that claim, is to support the edges of the elliptically curved aprons ; but the whole combination, as the claim also indicates, is for the purposes set forth in the specification, and the specification states that, “ when the neckband is passed around the neck and through under the shield, and drawn up to be fastened by the needle, K, the tension upon the ends, f f, of the long shield, E, will operate to impart such a curve to the shield and scarf as will produce a graceful, easy fit, the upper outer edges of the scarf being so stiffened aud supported by the extended ends of the shield as to be constantly maintained thereby in proper adjustment, while the elliptical curve of these edges prevents them from catching and engaging in the clothing.” This part of the specification bears especially upon claim 2, and the operation of the neckband, as here stated, is specially referred to in that claim. We hold, then, claim 2 sets forth the elements intelligibly, and presents an operating and patentable combination.
Claim 3 is for the invention of “ A flat scarf having its upper edge extended in a right line to bend upon the neck of the wearer, in combination with a stiffening piece or *371 shield projecting to the extremeties of said upper edge, and with a neckband so intersecting and engaging said upper edge at or near its extremities as to produce, when properly secured, a flexion of the shield and scarf, substantially as and for the purpose herein set forth.”
The meaning of the words, “ extended in a right line to bend” upon the neck of the wearer,” was disputed by the experts as well as at the argument. On the part of the complainants it was insisted that “ right line ” was equivalent to suitable line ; while the defendants contended that their meaning, and therefore the meaning of the claim, is left in fatal uncertainty by the patent and by the testimony. The phrase is infelicitous, but we think that the specification and drawings, to which again we are required to have reference, explain its meaning. The words “ right line ” had already been used several times in the descriptive portion of the specification, before they were used in this claim, in the sense of straight line. We should therefore impute to them the same meaning in this place, unless it should appear that by doing so we rendered the passage insensible or unreasonable, while, by giving to them a new and different meaning, we render it sensible and reasonable. As a straight line will bend upon the neck of the wearer when its ends are drawn back by the neckband, and as the purpose of the line proposed is that it shall so bend, we think the words “ right line ” may be sensibly and reasonably interpreted to mean straight line in this claim. 'However awkward the whole phrase may be, it imports, in our opinion, that the upper edge of the scarf is to' be extended in a right line, with a view of its bending on the neck of the wearer. But it is objected that the extent to which the upper edge of the scarf is intended by this claim to be a right or straight line, is left uncertain; and counsel have pointed out that the drawing which represents the front view of the scarf appears to show a straight line from one extremity to the other of the upper edge, while the drawing which presents the back of the scarf shows a straight line only between the inner corners of the aprons and outside of these points presents *372 curves. But the explanations of these drawings, which we find in the specification, leave no uncertainty as to the portion of the upper edge which is to be extended as, or is to be in the form of, a straight line. It is distinctly stated there that the elliptical curve of the apron begins -“at the upper corner of the inner edge of the apron ; ” and that statement limits the straight portion of the upper edge to the line between those upper corners of the inner edges. If either of the drawings fails to represent this fact, it must yield to the greater force of the explanation which states . what part of the upper edge is curved, and thereby show's what part of it is straight.
As to the second element, the shield, we are to understand that it projects to the extremities of the actual upper edge, in the manner explained and showm by the specification. We have already sufficiently considered this point in examining claim 2. In the claim now before us, the shield is not treated, and is not to be understood as projecting only to the extremities of the right or straight line just mentioned ; it is to project to the extremities of the upper edge of the scarf, and the specification explains, as we have said, that the upper edge consists partly of curves outside of the extremities of the straight line. As to the portion of the third element, the neckband, we do not understand that there is any dispute. We are of opinion, therefore, that the elements of the combination claimed in the third claim are intelligibly described. The remaining question is, whether they form an operative combination.
The object of this combination is to obtain flexion of the scarf and shield by means of the neckband. For this purpose it is necessary that they should bear upon a center point, namely, the neck, while the ends are drawn back. A straight line between the points to w'hich the force is applied furnishes this bearing point or center, and in this way the form of the line co-operates with the neckband in its work of flexion, and with the scarf and shield in enabling them to be thus flexed. The question at this point is, not whether a line of some other form would operate in the same way, but *373 whether this line co-operates with the other elements of the combination. Clearly it does, and all three of these elements are co-operative for the purpose described in the patent. We hold, then, that claim 3 presents a patentable combination.
It is claimed, however, by the defendants, that even if these combinations are patentable subjects, this patent is not valid, because the same combination had, prior to its issue, and before their embodiment by the complainants’ assignor, been used in other than flat scarfs, for example, in puffs, and there was no invention in merely applying them to flat scarfs ; and because they had been anticipated even in scarfs known in the trade as flat scarfs.
An enormous array of exhibits,,and of testimony relating to them, was presented to us ; but the defendants finally rested their claim of anticipation upon selected instances. We have carefully examined these, and have considered the testimony relating to their history. To discuss each of them separately would be unnecessary and unreasonable. We shall confine ourselves to a statement of our conclusion. We think that no instance has been established in which any one of these combinations—and it is only with combinations that we are dealing—had been embodied in either a flat scarf or other kind of scarf. We hold, therefore, that this patent is not invalidated by proof of anticipation.
It only remains to inquire whether it has been infringed by the defendants.. No question was made by them as to the fact that they used the combination set forth in elaims one and two. Their defence was simply that they had a right to use them because the patent was invalid. Some question was raised, however, as to the third claim. The upper edge of the scarf manufactured by the defendants presents a slightly curved line, concave downward. We think that, notwithstanding this slight departure from a right line, the scarf made and sold by defendants constitutes an infringement of the combination set out in the third claim, also, as well of those described in the first and second. The office of the right line mentioned in claim three was to *374 effect the bending of the scarf by furnishing a centre point at which the resistance was to act. A slightly curved line which acts in precisely the same way does not constitute a substantially new element.
It may be observed, in conclusion, that this patent relates only to that class of scarfs known as flat scarfs. No claim is made in it for the invention of any single element of any of the combinations ; the claims are made, and the patent is granted for the invention of combinations only.
It is shown that the scarfs manufactured and sold by the defendants are flat scarfs, within the meaning of this patent, and that they constitute an infringement. The relief prayed in the bill must therefore be granted.